## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

CS TECHNOLOGY, INC. and
SITEHANDS, INC.,

      Plaintiffs,

  v.

HORIZON RIVER TECHNOLOGIES, LLC,

      Defendant.

Case No. 3:18-cv-00273

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Jason S. McCarter, NC Bar No. 28371
Lee Peifer, *Pro Hac Vice*
John Sharpe, *Pro Hac Vice*
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree St., NE, Suite 2300
Atlanta, GA 30309-3996
(404) 853-8000 (t)
(404) 853-8806 (f)
JasonMcCarter@eversheds-sutherland.com
LeePeifer@eversheds-sutherland.com
JohnSharpe@eversheds-sutherland.com

James C. Smith, NC Bar No. 8510
NEXSEN PRUET, PLLC
227 W Trade St #1500
Charlotte, NC 28202
(704) 339-0304 (t)
(704) 338-5377 (f)
JSmith@nexsenpruet.com

*Attorneys for Horizon River Technologies, LLC*

# TABLE OF CONTENTS

I.      Response to Plaintiffs' Statement of "Undisputed" Facts.................................... 1

II.     Argument and Citation of Authorities.............................................................. 15

      A.      Plaintiffs Are Not Entitled to Summary Judgment on Any Contractual Claims... 15

           1.      Plaintiffs' claim for breach of contract depends on unfounded assumptions and disputed facts related to their performance and billing practices....... 15

           2.      Plaintiffs' attacks on HRT's contract claim fail to show an absence of genuine factual disputes related to Plaintiffs' poor performance and improper billing. .................................................................................. 19

           3.      Plaintiffs' claim for account stated (Count II) fails as a matter of law. .... 20

      B.      Plaintiffs Are Not Entitled to Summary Judgment on Their Remaining Claims for Misrepresentation and Deceptive Trade Practices. ............................... 20

           1.      Plaintiffs' tort claims fail as a matter of law. ........................................... 20

           2.      Even if Plaintiffs' tort claims were not barred as a matter of law, genuine disputes of material fact would preclude a summary judgment in their favor. .................................................................................................. 21

      C.      Plaintiffs Are Not Entitled to Summary Judgment on HRT's Non-Contractual Claims for Misrepresentation, Deceptive Trade Practices, and RICO Violations.22

           1.      There are genuine disputes of material fact related to Plaintiffs' scheme of improper and deceptive billing practices with respect to HRT and nonparties. .............................................................................................. 22

           2.      Documents with facts that may be essential to support HRT's counterclaims have not yet been produced under the Court's recent discovery order. ......................................................................................... 24

III.    Conclusion ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*42 E., LLC v. D.R. Horton, Inc.*, 218 N.C. App. 503, 722 S.E.2d 1 (2012) .................................17

*Ball v. Maynard*, 184 N.C. App. 99, 645 S.E.2d 890 (2007)...................................................15, 17

*Bank of Am. Corp. v. SR Int'l Bus. Ins. Co., SE*, No. 05 CVS 5564, 2007 WL 4480057 (N.C. Super. Ct. Dec. 19, 2007).................................................................................23

*Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 418 S.E.2d 694 (1992) ..................................................................................................................................20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................19

*Dishner Developers, Inc. v. Brown*, 145 N.C. App. 375, 549 S.E.2d 904 (2001) ..................16–17

*Fletcher v. Jones*, 314 N.C. 389, 333 S.E.2d 731 (1985) ............................................................17

*Forest2Market, Inc. v. Arcogent, Inc.*, No. 15 CVS 9547, 2016 WL 56279 (N.C. Super. Ct. Jan. 5, 2016).................................................................................................20, 21

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264 (4th Cir. 2013) ..............................................................................................25

*Guessford v. Pa. Nat'l Mut. Cas. Ins. Co.*, No. 1:12CV260, 2013 WL 12136501 (M.D.N.C. May 24, 2013) ....................................................................................................1

*Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214 (4th Cir. 2002)..............................25

*Iron Steamer, Ltd. v. Trinity Rest., Inc.*, 110 N.C. App. 843, 431 S.E.2d 767 (1993)..................................................................................................................................18

*Kelly v. Ga.-Pac. LLC*, 671 F. Supp. 2d 785 (E.D.N.C. 2009)....................................................20

*Mahaffey v. Sodero*, 38 N.C. App. 349, 247 S.E.2d 772 (1978).................................................20

*McCray v. Md. Dep't of Transp.*, 741 F.3d 480 (4th Cir. 2014)...................................................25

*Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010)........................................................................25

*Salem Realty Co. v. Batson*, 256 N.C. 298, 123 S.E.2d 744 (1962) ...........................................16

*Simmons v. Morton*, 1 N.C. App. 308, 161 S.E.2d 222 (1968).....................................................22

*Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 400 S.E.2d 476 (1991) ............................21

*Superguide Corp. v. DirecTV Enters.*, No. CIV. 1:00CV144, 2008 WL 1944233 (W.D.N.C. Apr. 30, 2008) .........................................................................................2

*Wheeler v. Wheeler*, 299 N.C. 633, 263 S.E.2d 763 (1980) ........................................17

**Rules**

Fed. R. Civ. P. 56(d) .....................................................................................................24

N.C. R. Civ. P. 56(c) .....................................................................................................23

LCvR 7.1(d) ...................................................................................................................1

Plaintiffs' motion for summary judgment (Docs. 166–210) is based on the false premises (1) that there are no genuine disputes about their poor performance and improper billing practices under the parties' IT-services contract and (2) that Plaintiffs could have reasonably relied on alleged misrepresentations during unsuccessful settlement negotiations. Contrary to Plaintiffs' arguments, genuine disputes of material fact preclude summary judgment on either side's claims for breach of contract, and Plaintiffs' claim for account stated based on alleged settlement negotiations fails as a matter of law. Plaintiffs' remaining claims, for misrepresentation and deceptive trade practices, are barred by North Carolina's economic-loss rule and Plaintiffs' inability to prove essential elements of those claims. Finally, Plaintiffs' arguments attacking Defendant HRT's non-contractual counterclaims for misrepresentation, deceptive trade practices, and RICO violations ignore material facts and the reality that Plaintiffs and nonparties have not yet produced documents under the Court's order (Doc. 162) on HRT's motions to compel (Docs. 145, 146). Plaintiffs' motion should be denied.

## I. RESPONSE TO PLAINTIFFS' STATEMENT OF "UNDISPUTED" FACTS

HRT responds to the numbered paragraphs in Plaintiffs' improperly single-spaced statement of facts[1] in the following counterstatement of supported facts ("CSF"):

---

[1] Plaintiffs' 25-page summary-judgment brief contains a 4½-page, *single-spaced* recitation of facts, which Plaintiffs incorrectly describe as "undisputed." (Pls.' MSJ Br., Doc. 167, at 8–12.) The Court's rules provide that "the page limit for any brief is 25 pages . . . double-spaced," LCvR 7.1(d), and Magistrate Judge Cayer has expressly denied Plaintiffs leave to exceed that limit. (Text-Only Order, Jan. 21, 2020.) Although HRT has managed to respond to all of Plaintiffs' "facts" without violating the local rules, the Court is free to reject Plaintiffs' brief *sua sponte* in whole or in part. *See Guessford v. Pa. Nat'l Mut. Cas. Ins. Co.*, No. 1:12CV260, 2013 WL 12136501, at *2 (M.D.N.C. May 24, 2013) ("Although the majority of the text included within [Plaintiffs'] brief[] is double-spaced, [that] brief includes a recitation of the facts presented in single-spaced, numbered paragraphs . . . . [T]he use of such a deliberate and blatant attempt to avoid the Local Rules for one party's advantage [should] not be permitted by this Court."); *see also id.* at *3 (declining to consider summary-judgment briefs that exceeded the

1.      It is undisputed that HRT hired Plaintiffs in mid-2016 to help update the IT infrastructure at various Massage Envy ("ME") franchises (the "Project"). (Decl. of J. Sharpe (hereinafter "Sharpe") Ex. 1, Dep. of Jef Wallace 55:8–57:10.) The parties signed a Master Services Agreement ("MSA") and Scope of Work ("SOW"), and in December 2016, CST assigned its rights and duties under the parties' contract to Sitehands. (MSA, Doc. 126-4; SOW, Doc. 127; Consent to Assignment, Doc. 173.) Plaintiffs' work generally fell into one of three categories: (1) "P4" installations to update IT infrastructure in existing ME locations; (2) "New Build" work to install similar infrastructure at new locations; and (3) "break-fix" or "general support" work. (SOW, Doc. 127, §§ 1, 2, Schedules A–C; Sharpe Ex. 1, Wallace Dep. 85:15–86:24, 89:1–92:13, 208:13–209:20; Sharpe Ex. 7, Dep. of Rob Carbone (Plaintiffs' 30(b)(6) representative) 29:1–17, 66:9–68:8, 211:12–23.) The parties agreed that P4 installations would be charged at a fixed fee (Compl., Doc. 1, ¶¶ 20, 32; *see also id.* ¶¶ 21–22, 33; HRT Answer, Doc. 10, ¶ 32), while New Build work would be charged on a site-by-site basis. (Sharpe Ex. 10, HRT_0000048 (Plaintiffs stating they would "prepare bespoke quotes" for each New Build); Sharpe Ex. 11, HRT_0154974 (Plaintiffs acknowledging "a flat fee model [did] not make sense" for New Builds); Sharpe Ex. 37, SITEHANDS_0000481 (Plaintiffs recognizing "the P4 install is the one amount of $748.42").) Break-fix and general support work, as distinct from the work required for a P4 installation, were subject to hourly rates. (SOW, Doc. 127, Schedules B, C.)

2.      Although HRT knew before signing the MSA and SOW that ME generally wanted to pay fixed fees for HRT's work (Sharpe Ex. 1, Wallace Dep. 86:18–24, 95:6–17, 215:20–

---

local rules' page limit and contained single-spaced text); *Superguide Corp. v. DirecTV Enters.*, No. CIV. 1:00CV144, 2008 WL 1944233, at *1 (W.D.N.C. Apr. 30, 2008) (*sua sponte* striking summary-judgment briefs with excess pages on grounds those evading page limits "deprives the Court and the parties of the benefit of forcing the movants to separate the wheat from the chaff, by presenting their strongest arguments rather than presenting all of their arguments").

216:14), HRT continued to negotiate certain pricing terms with ME and Plaintiffs during the Project. (Sharpe Ex. 1, Wallace Dep. 67:19–68:9 (explaining how Plaintiffs worked with HRT to "revise pricing as [HRT] learned of new information or requests from [ME]").)

3.    HRT acknowledges receiving periodic invoices from Plaintiffs, but Plaintiffs struggled with their work on the Project from the outset. (Sharpe Ex. 5, Dep. of Bruce Webster 98:22–99:3; Webster Report, Doc. 126-2, ¶ 17; Sharpe Ex. 3, Dep. of Bob Fletcher 24:4-27:20 (discussing unprofessional and potentially criminal behavior of Plaintiffs' technicians, including sexual harassment of ME employees); Sharpe Ex. 12, SITEHANDS_0013527 (Plaintiffs' employees discussing one of their subcontractors "f[ – ]ing up beyond belief"); Sharpe Ex. 13, HRT_0029222 (Plaintiffs' employees lamenting a subcontractor whose services were "BEYOND f[ – ]ed up"); Sharpe Ex. 14, SITEHANDS_0078306 (Plaintiffs' employee working on the Project admits that he is "incompetent" and deserved "to be fired"); Sharpe Ex. 38, HRT_0053394 (Plaintiffs' Chief Revenue Officer stating that they were "prepared to do whatever it takes to get this right" in light of technician issues).) Moreover, in October 2016, HRT notified Plaintiffs that their invoices were inconsistent with the parties' agreement. (Sharpe Ex. 15, HRT_0148159 (Email from HRT to Plaintiffs disputing invoice).) HRT disputed Plaintiffs' invoices for the remainder of the Project through the date Plaintiffs walked off the job. (*See* CSF ¶¶ 6–8 (detailing ongoing invoice dispute between October 2016 and June 2017).)

4.    Although the amounts paid to HRT by ME are irrelevant here, ME and its franchisees did not, as Plaintiffs state, pay HRT "in full" for Plaintiffs' work on the Project. (Sharpe Ex. 1, Wallace Dep. 248:11–22 (noting difference between amount HRT invoiced ME and amount HRT has been paid).) For example, under HRT's contract with ME, ME agreed that each franchise would pay HRT a fixed fee for P4 work. (Sharpe Ex. 1, Wallace Dep. 67:3–68:9,

86:18–24, 94:5–95:17, 213:16–21; HRT/ME Statement of Work, Doc. No. 203; ME/HRT Amended Statement of Work, Doc. No. 204.) Yet because payments from ME to HRT were not directly dependent on the timing or quality of Plaintiffs' work, HRT often invoiced ME franchisees for P4 work before the work was performed and before receiving a corresponding invoice from Plaintiffs, and franchisees did not always timely pay HRT's invoices. (Sharpe Ex. 1, Wallace Dep. 199:18–202:4, 243:16–244:8; Decl. of C. Harrison ¶¶ 4–5.) Notably, HRT's invoices to ME included costs related to equipment and services well-beyond those provided by Plaintiffs. (Sharpe Ex. 2, Dep. of Steve Koura 77:12–79:21, 135:9–136:6; Harrison Decl. ¶ 5.)

5.      Again, HRT charged ME fixed fees for a broader array of services on a different schedule than Plaintiffs' work for HRT, so the charges on Plaintiffs' invoices were not passed through to ME. (*See* CSF ¶¶ 3–4; Sharpe Ex. 1, Wallace Dep. 67:3–68:9, 86:18–24, 94:5–95:17, 213:16–21.) HRT was paid for fulfilling its contractual obligations to ME, regardless of whether it fulfilled those obligations on its own, with Plaintiffs' assistance, or with the use of replacement subcontractors that HRT retained after Plaintiffs walked off the job. (Harrison Decl. ¶¶ 4–5.) The improper amounts on Plaintiffs' invoices substantially reduced HRT's profit margin, but there was no direct pass-through relationship between Plaintiffs' work and amounts paid to HRT. (*Id.*)

6.      Section 2.1 of the MSA contains an "Acceptance Protocol" that required Plaintiffs to take all reasonable efforts to remedy "any material non-conformities" in their work upon notice. (MSA, Doc. 126-4, § 2.1.) That protocol concerns the quality of Plaintiffs' work and does not by its terms apply to disputed invoices. (*Id.*) That aside, and despite HRT's challenges trying to decipher Plaintiffs' invoices (Sharpe Ex. 1, Wallace Dep. 252:19–253:9), HRT gave ample notice of disputed charges. HRT notified Plaintiffs in October 2016 that it was disputing an invoice because Plaintiffs were improperly charging more than the agreed fee for P4

installations. (Sharpe Ex. 15, HRT_0148159 (HRT email).) HRT continued disputing invoices through the date Plaintiffs walked of the job. (Sharpe Ex. 16, HRT_0148667 (HRT requesting additional detail on invoice); Sharpe Ex. 17, HRT_0148051 (HRT requesting "some time with [Plaintiffs] to discuss a few pressing questions . . . with the invoices"); Sharpe Ex. 18, HRT_0148684 (Plaintiffs' email acknowledging HRT's "questions on invoicing"); Sharpe Ex. 19, HRT_0148658 (HRT email recounting that it had "disputed the remediation charges for the Nov, Dec, Jan invoices and provided specific examples of the charges [it] disputed beyond the fixed price we have contracted with [Plaintiffs]"); Sharpe Ex. 20, SITEHANDS_0000042 (HRT email summarizing disputed charges); Sharpe Ex. 21, SITEHANDS_0000073 (HRT email to Plaintiffs: "I would like us to review and reconcile the disputed amounts as quickly as possible . . . ."); *see also* CSF ¶ 8 (regarding November–March invoices).)

 7. Beginning around February 2017, when Plaintiffs were well aware of ongoing invoice disputes, they threatened to "freeze" all work on the Project to coerce HRT to pay disputed amounts. (Doc. 206 (Feb. 2017 email); Sharpe Ex. 19, HRT_0148658.) Thereafter, HRT agreed to participate in a good-faith review of the disputed invoices to identify improper charges. (Harrison Decl. ¶¶ 13–16; Sharpe Ex. 3, Fletcher Dep. 49:20-55:15 (explaining invoice review).)

 8. It is undisputed that the parties engaged in an invoice review in the spring of 2017 to identify and eliminate various overcharges in Plaintiffs' November 2016 to March 2017 invoices. (Sharpe Ex. 3, Fletcher Dep. 48:25–49:5 (describing process to "go through a series of monthly invoices, line by line, and to gather more information on things that did not look like they were standard, review hours and review supporting documentation for those hours"); Sharpe Ex. 22, HRT_0092955 (Plaintiffs' email to HRT noting that the parties would "[g]o through detail on the [invoices] to make sure we all understand the drivers of the charges").) HRT

participated in that process in good faith, and Plaintiffs did not refuse to negotiate on the ground that HRT's concerns were time-barred. (Harrison Decl. ¶¶ 13–16.)

HRT employee Bob Fletcher did not, as Plaintiffs contend, agree to final payment amounts with Plaintiffs, nor did he have—or represent he had—the authority to do so. (Sharpe Ex. 3, Fletcher Dep. 48:11–49:19, 58:5–16; (Sharpe Ex. 2, Koura Dep. 121:6–122:21; Sharpe Ex. 1, Wallace Dep. 260:4–6 ("My recollection is Bob [Fletcher] was asked to help justify the hours, not the amounts, and did the hours make sense.").) Fletcher did send an email stating he would be "the one who certifies payment" (Fletcher email, Doc. 208), but he meant only that he was HRT's representative to assist in identifying improper charges. (Sharpe Ex. 3, Fletcher Dep. 63:7–18 ("So I may have used the word 'certified' because I'm about to measure hours against what I consider to be a standard. But let me tell you what it doesn't mean. It doesn't mean I have the authority to approve any payments at all.") And HRT confirmed, by no later than May 12, 2017, that Steve Koura, its Chairman, would sign off on any payment of disputed invoices. (MSA, Doc. 126-4, § 8.1 (disputes to be resolved by "executive officers"); Sharpe Ex. 21, SITEHANDS_0000073 ("[L]et me be clear about this . . . the process states that the executive of the companies will discuss and reconcile the disputed invoices . . . I AM the executive of the company . . . [Bob Fletcher] and [Sitehands employee Michael Murphy] are effectively working through the details to present us with the necessary information and their opinions and per our contract it is up to the Contract executives to then reconcile."); *see also* Sharpe Ex. 23, HRT_0156670 (April 24, 2017 Koura email to Plaintiffs: "Let's get this resolved today and I can remit a same day wire.") *cf.* CSF ¶ 6 (citing statements by Koura to Plaintiffs that he was the individual at HRT who could authorize payment).)

      9.     Plaintiffs offered to reduce their overcharges by approximately $70,000, but the

invoice review did not result in any settlement or "agreement" by HRT to pay all remaining amounts. (Harrison Decl. ¶ 15; CSF ¶ 8.) Plaintiffs cite Exhibit 14 to the Declaration of Keith Carroll (Doc. 181) and Exhibit D to the Declaration of Michael Murphy (Doc. 209), which are dated April 29, 2017, and contain a chart Plaintiffs prepared in ongoing negotiations to resolve disputed invoices. But Plaintiffs did not present the chart as a settlement agreement and acknowledged after sending the chart a "need for further discussion around the resolution of the remaining disputed invoices." (Sharpe Ex. 24, HRT_0155214; Murphy Decl., Doc. 170, ¶ 7 (conceding that the invoice review was "subject to further investigation prior to payment").)

10.     Because the parties had not reached an agreement or settlement for the disputed amounts after the joint invoice review, HRT continued disputing Plaintiffs' invoices. (*See* CSF ¶¶ 6–8; Sharpe Ex. 1, Wallace Dep. 260:6–10 ("[A]fter [the invoice review] there were subsequent conversations that included [HRT's Chairman] to try to come to a solution . . . ."); Sharpe Ex. 25, SITEHANDS_0000038 (May 2017 email from Plaintiffs expressing hope that the parties "will be able to get this squared away"); Sharpe Ex. 26, HRT_0155217 (May 2017 email from Plaintiffs requesting payment for "undisputed portion of outstanding invoices"); Murphy Decl., Doc. 170, ¶ 7 (conceding the invoice review was "subject to further investigation prior to payment").) Nevertheless, as a sign of good faith, HRT continued to make substantial payments even after the invoice review, in the amount of at least $300,000. (Sharpe Ex. 7, Carbone Dep. 137:24–138:9 (admitting HRT made substantial payments after invoice review); Compl. ¶ 57.)

11.     Around February or March 2017, HRT contacted various providers to gauge their ability to assist if Plaintiffs carried out their threats to abandon the Project. (Harrison Decl. ¶ 13.) Yet HRT continued to work exclusively with Plaintiffs with respect to their Project duties until they walked off the job in June 2017 (despite payments from HRT). (Harrison Decl. ¶ 13; *see*

7

Sharpe Ex. 1, Wallace Dep. 268:5–269:7 (explaining that HRT engaged other subcontractors to do work Plaintiffs left unfinished); Sharpe Ex. 7, Carbone Dep. 137:24–138:9.)

12.     HRT neither promised to "resolve" the billing dispute over Plaintiffs' invoices nor to pay "agreed upon amounts"; rather, it committed to, and did, participate in a good-faith review of the disputed invoices to identify improper charges. (*See* CSF ¶¶ 7–10.) Plaintiffs' own representative in the invoice review, Michael Murphy, has declared that it was "HRT's willingness to engage in this invoice review process" that Plaintiffs supposedly relied on to continue work on the Project—not some promise to "resolve" all disputes (which could not have been predicted in advance). (Murphy Decl., Doc. 170, ¶ 5.) Murphy acknowledged that even after the invoice review, there were numerous outstanding issues that the parties needed to resolve. (*Id.* ¶¶ 8, 10–16 (testifying certain charges were disputed and subject to further investigation); *see also* Sharpe Ex. 21, SITEHANDS_0000073 (May 2017 Koura email to Plaintiffs: "I would like us to review and reconcile the disputed amounts as quickly as possible . . . .").)

13.     HRT does not dispute that Plaintiffs sent invoices totaling $792,670.93 during and after April 2017, but HRT denies Plaintiffs' suggestion that those invoices reflected amounts actually owed under the parties' contract. Not all underlying work was done in that period, not all work was necessary or proper, and not all work was billed according to the parties' contract. (*See, e.g.*, Sharpe Ex. 27, SITEHANDS_0075859 (Plaintiffs' internal email requesting "bogus tech info" to include on invoice to HRT); Sharpe Ex. 28, SITEHANDS_0078461 (Plaintiffs' email instructing a subcontractor to "bake the travel into the labor costs"); Sharpe Ex. 29, HRT_0033742 (Plaintiffs' internal email noting that although "the math isn't right," Plaintiffs would "make money on this after it's all said and done"); CSF ¶ 17 (regarding Plaintiffs' change

in position on New Build pricing).) Further, as noted above, HRT never agreed to pay disputed invoice amounts. (CSF ¶¶ 7–11 (explaining Fletcher's "certifies payment" email).)

14.     HRT witnesses Jef Wallace and Steve Koura acknowledged that the SOW provides hourly rates for "break fix" or "general support," as distinct from P4 or New Build work, but Plaintiffs routinely mischaracterized P4 and New Build work as break-fix or general support in order to overbill HRT without justification under the parties' contract. (*See* CSF ¶ 1; Gould Report, Doc. 126-3, at 6–8 (discussing misclassification of hours); Sharpe Ex. 1, Wallace Dep. 99:6–103:13; Sharpe Ex. 2, Koura Dep. 133:14–134:15, 145:12–156:21.)

15.     HRT does not dispute that a network operating center ("NOC") provided limited telephone assistance to Plaintiffs' technicians in the field (Sharpe Ex. 1, Wallace Dep. 108:3–23), but HRT denies that those NOC resources were responsible for unreasonable hold times or significant delays to any material extent. In fact, activity reports show the average wait time for a technician calling the NOC was less than 2 minutes. (Sharpe Ex. 30, HRT_0000469–471.)

16.     Although the SOW allowed Plaintiffs to charge a $140 "Site Rescheduling Fee" for some circumstances beyond a technician's control, HRT denies that any significant portion of Plaintiffs' disputed charges could be plausibly attributed to those circumstances. (SOW, Doc. 127, §§ 4.3, 4.4.) Of the more than $1.6 million Plaintiffs invoiced HRT, less than $5,000 is attributable to the rescheduling fee. (Gould Report, Doc. 126-3, Schedule 3.6.)

17.     The SOW does not, as Plaintiffs state, establish an $11,465 fixed price for New Build work. (CSF ¶ 1.) The term "New Site Buildout" is a single line item within a chart titled "(Optional) MAC (Move, Add, Change) Work." (*See* SOW, Doc. 127, Schedule C.) In the next column titled "Business Hours Rate," there appears the amount "$11,465/ Per Site." (*Id.*) Contemporaneous documents show that Plaintiffs considered the $11,465 figure a "SWAG"

number, slang for a "scientific wild a[–] guess," and that they would provide individualized quotes for all New Build work. (Sharpe Ex. 37, HRT_0000048; Sharpe Ex. 8, Stockley Dep. 56:3–57:18 (explaining SWAG number).) Plaintiffs routinely charged HRT less than $11,465 for New Build work. (Sharpe Ex. 6, Dep. of Leanne Gould 102:14–103:6.) Only late in the Project did Plaintiffs inexplicably take the position that they could charge HRT $11,465 on every New Build. (Sharpe Ex. 31, SITEHANDS_0009603 (May 2017 email from Plaintiffs stating "we are going to make whole all of the past new build we did not bill the whole $11,465").) As HRT witness Jef Wallace further explained, the $11,465 figure was for a scope that "wasn't performed," and because the scope actually performed for New Builds was less than originally anticipated at the vast majority of sites, Plaintiffs submitted numerous itemized invoices with amounts "far less than [$]11,465." (Sharpe Ex. 1, Wallace Dep. 233:16–236:12, 281:10–282:16.)

18. HRT agrees that Schedule A of the SOW set a fixed fee for P4 installations, which was increased from $689.25 to $748.42 to cover color-coded cables. (CSF ¶ 1; Sharpe Ex. 32, HRT_0014341 (unchallenged statement in HRT email to Plaintiffs that "you guys fixed priced the [P4] install"); Sharpe Ex. 20, SITEHANDS_0000042 (unchallenged statement in HRT email to Plaintiffs regarding the "fixed price" P4 install); Sharpe Ex. 1, Wallace Dep. 89:19–25.)

19. The part of SOW that set a fixed fee for P4 work contains a line item for "Labor Hours," reflecting Plaintiffs' estimate that P4 installations should take 5.5 labor hours based on Plaintiffs' capabilities. (SOW, Doc. 127, sched. A.) But Plaintiffs could not charge HRT more than the fixed fee even if the installation took longer than 5.5 hours. (CSF ¶¶ 1, 4, 6, 17–18.)

20. HRT denies Plaintiffs' false assertion that the contractual language does not establish a fixed price for P4 installations. (*See* Complaint, Doc. 1, ¶¶ 20–22, 32–33; HRT Answer, Doc. 10, ¶ 32; CSF ¶¶ 1, 4, 6, 17–18.)

21.     HRT agrees that the SOW did not tell Plaintiffs how many technicians to use at a given location, but P4 installations were to be billed at a fixed price per site—regardless of how many technicians Plaintiffs used to complete their work at each location. (CSF ¶¶ 1, 4, 6, 17–19.)

22.     The SOW expressly provides that "[a]ll pricing includes administration, coordination technician travel time, and CST overhead." (SOW, Doc. 127, § 6.2.) Plaintiffs were therefore contractually barred from billing HRT separately for technician travel time, and their statements to the contrary are wrong. And Plaintiffs were not authorized to *deceptively* bill travel time as labor in any event. (MSA, Doc. 126-4, § 1.7 (requiring Plaintiffs to keep "reasonably complete and accurate records of the fees and expenses charged to" HRT); CSF ¶ 28.)

23.     Contrary to Plaintiffs' assertion, HRT has identified numerous ME store locations at which Plaintiffs breached the MSA and SOW. (HRT's Supp. ROG Resp., Doc. 168-4, ¶¶ 1–2; Harrison Decl. ¶ 10.) Further, HRT denies any suggestion that it is contractually obligated to give a store-by-store account of how Plaintiffs breached the MSA and SOW.

24.     Contrary to Plaintiffs' assertion, HRT has identified the amounts it was overbilled by Plaintiffs with respect to numerous ME store locations. (Harrison Decl. ¶ 10; Gould Report, Doc. 126–3, Sub-Schedules 1.1, 2.1, 2.2, 3.2 (identifying amounts Plaintiffs overbilled HRT with respect to specific ME sites). Regardless, HRT denies any suggestion that it is contractually obligated to give a store-by-store account of Plaintiffs' fraudulent billings.

25.     Plaintiffs' assertion that HRT has not identified amounts it overpaid Plaintiffs with respect to specific ME store locations is misleading. Plaintiffs did not submit separate invoices to HRT for each ME site, and their monthly invoices covered work at multiple locations. (*See, e.g.*, Doc. 176 (Plaintiffs' March 2017 invoice).) Similarly, when HRT paid amounts toward disputed invoices, it was not simply paying for specific ME sites. For example, after the parties' spring

2017 invoice review, HRT paid about $300,000 toward Plaintiffs' invoices without specifying the individual ME sites to which payments corresponded. (Sharpe Ex. 7, Carbone Dep. 137:24–138:9 (admitting HRT made substantial payments after invoice review); Compl. ¶ 57.)

26.     Contrary to Plaintiffs' assertion, HRT has identified stores where it sent technicians to do remediation work. (*See* Sharpe Exs. 33–35, HRT_0038937, HRT_0038975, HRT_0039005 (emails between HRT and remediation subcontractor regarding specific ME site).

27.     Contrary to Plaintiffs' assertion, although HRT is still waiting for Plaintiffs and some of their subcontractors to produce additional records (McCarter Rule 56(d) Decl.), HRT has already identified (and reserves the right to supplement) ample evidence of its damages. (Sharpe Ex. 6, Gould Dep. 140:3–141:18 (Plaintiffs overbilled HRT by approximately $524,000); Sharpe Ex. 1, Wallace Dep. 183:4–20 (HRT spent approximately $600,000 in remediation costs).)

28.     In its interrogatory responses, HRT provided a non-exhaustive list of 11 ME store locations for which Plaintiffs had fraudulently billed travel time as labor hours. (HRT Supp. ROG Resp., Doc. 168-4, ¶ 2.) This fraudulent billing practice extended to at least several other ME locations. (Harrison Decl. ¶ 10.) HRT has identified fraudulent charges by comparing invoices Plaintiffs received from their subcontractors with invoices Plaintiffs sent to HRT. (Harrison Decl. ¶¶ 8–10.) HRT reserves the right to supplement the evidence of Plaintiffs' fraudulent billing practices after Plaintiffs and their subcontractors finish producing documents in response to Magistrate Judge Cayer's recent order (Doc. 162) on HRT's motions to compel.

29.     There is evidence that Plaintiffs defrauded other customers in addition to HRT, despite Plaintiffs' refusal to produce invoices they sent to other customers for their work. (Sharpe Ex. 4, Dep. of Behz Akhund 78:14–21 ("I was asked to reclassify work or travel time and additional expenses as work time so that it can be invoiced to JPMC."); *cf.* Order, Doc. 162.)

30.     HRT disputes Plaintiffs' contention that there is "no evidence" of their billing disputes with other customers. (*See* CSF ¶ 29; Akhund Decl., Doc. 111, ¶¶ 9–15.)

31.     Plaintiffs' characterization of Behz Akhund's testimony is incomplete and misleading. Akhund is one of Plaintiffs' former employees and testified that (1) they routinely instructed him to misclassify travel time as labor on the Project and on work performed for their other customers; (2) the purpose of reclassifying travel as labor was to allow Plaintiffs to recover costs that otherwise would not have been allowed under the contracts with with HRT and their other customers; and (3) he was instructed to misclassify travel as labor hours with respect to work performed by "all" of Plaintiffs' numerous subcontractors on the Project (regardless of any particular location). (Akhund Dep. 79:7–80:9, 80:25–81:8, 83:1–25).

32.     Plaintiffs' characterization of Bruce Webster's testimony is incomplete and misleading. Webster, an expert on IT and project management, identified "serious problems with the quality and reliability of plaintiffs' installations." (Sharpe Ex. 5, Webster Dep. 101:16–102:24.) Using his industry expertise to evaluate Plaintiffs' invoices against their promised levels of service, he also identified numerous specific ME store sites where Plaintiffs billed HRT for charges that were not justified by the work done or where the hours Plaintiffs billed "greatly exceeds the actual complexity of the task at hand." (Sharpe Ex. 5, Webster Dep. 178:12–179:8; Webster Report, Doc. 126-2, Ex. 6 (identifying "Suspicious Billings").

33.     Plaintiffs' characterization of Leanne Gould's testimony is incomplete and misleading. Gould, HRT's damages expert, analyzed every line item in Plaintiffs' invoices and concluded that they had overbilled HRT by at least $524,000. (Sharpe Ex. 6, Gould Dep. 11:1–24, 140:18–149:4.) Gould's report also identifies specific ME stores where Plaintiffs overbilled HRT. (Gould Report, Doc. 126-3, Sub-Schedules (noting clinic numbers).)

34.     HRT admits that, in an interrogatory response, it identified an email exchange that shows Plaintiffs instructed their subcontractor Pinebreeze to disguise travel hours as labor and that Plaintiffs billed those amounts through to HRT. (168-6, ¶ 1; Harrison Decl. ¶ 9.)

35.     Plaintiffs' characterization of the testimony of Pinebreeze is incomplete, misleading, and, in some respects, entirely inaccurate. Pinebreeze testified that (1) it was instructed by Plaintiffs to bill travel hours as labor; (2) Plaintiffs rejected Pinebreeze's invoices if travel was not billed as labor; and (3) Pinebreeze was asked to bill travel as labor on numerous invoices corresponding to at least three ME stores, and further that Pinebreeze and Plaintiffs entered into an agreement regarding potentially billing for travel at other locations. (Sharpe Ex. 9, Pinebreeze 30(b)(6) Dep. 45:14–46:2, 48:15–50:4, 67:16–71:5; *see also* Sharpe Ex. 36, Travel Agreement Email.) It is immaterial whether Pinebreeze has knowledge of how Plaintiffs billed HRT, especially when other evidence shows that Plaintiffs improperly disguised Pinebreeze's travel time as labor hours and billed HRT for that time. (*See, e.g.*, Harrison Decl. ¶¶ 9–10.)

36.     HRT admits that, in an interrogatory response, it identified the testimony of Behz Akhund and emails between Plaintiffs and Pinebreeze as evidence supporting HRT's claims with respect to Plaintiffs' work for JPMorgan Chase and Bank of America. HRT denies that this is the "only" supporting evidence on this issue. (*Cf.* Doc. 202, BOA0000005 (Plaintiffs' Consulting Services Agreement with BofA § 6.2 (prohibiting billing for travel)); Order, Doc. 162.)

37.     Behz Akhund did not see Plaintiffs' final bills to JPMorgan Chase to confirm that travel time billed by Plaintiffs' subcontractors was disguised as labor, but there is evidence that is what happened. (CSF ¶ 31.) Akhund testified, "I was told that travel time and expenses were not to be billed back to JPMC unless agreed upon. So that is the reason why we were asked—or I was asked to reclassify those line items as labor time, so that we could bill those back to JPMC

as labor time." (Sharpe Ex. 4, Akhund Dep. 80:25–81:8; *accord* Akhund Decl., Doc. 111, ¶ 14.)

38.      HRT denies Plaintiffs' contention that there is "no evidence of any fraudulent billing scheme." Plaintiffs' agreement with Bank of America prohibited them from billing travel as labor. (Doc. 202, BOA0000005 (Consulting Services Agreement § 6.2).) The Court has ordered Plaintiffs to produce their invoices and subcontractor invoices for work with Bank of America if and when their motion to dismiss HRT's RICO claim is finally denied. (Order, Doc. 162.)

39.      Plaintiffs' witness Robert Carbone may have claimed that Plaintiffs did not improperly bill JPMorgan Chase for travel time, but he *also* testified that Plaintiffs did not bill *HRT* for travel time disguised as labor hours on Pinebreeze invoices—testimony that is demonstrably false. (Carbone Decl., Doc. 210, ¶ 18; *cf. CSF* ¶¶ 35–36.) HRT expects to find more evidence of Plaintiffs' improper billing once Plaintiffs and their subcontractors finish producing documents under the Court's order on HRT's motions to compel. (Order, Doc. 162.)

Additional undisputed material facts are summarized in HRT's brief supporting its own motion for partial summary judgment (Doc. 164, at 2–7).

## II.      ARGUMENT AND CITATION OF AUTHORITIES

**A.      Plaintiffs Are Not Entitled to Summary Judgment on Any Contractual Claims.**

**1.      Plaintiffs' claim for breach of contract depends on unfounded assumptions and disputed facts related to their performance and billing practices.**

Plaintiffs' assertion that "[t]he evidence definitively establishes that HRT breached its clear obligations under the MSA and SOW [merely] by refusing to pay Plaintiffs' invoices" (Pls.' MSJ Br., Doc. 167, at 13) mischaracterizes the record and ignores genuinely disputed material facts. "It is well settled that where one party breaches a contract, the other party is relieved from the obligation to perform." *Ball v. Maynard*, 184 N.C. App. 99, 108, 645 S.E.2d 890, 897 (2007).

And HRT began expressing serious concerns about Plaintiffs' deficient performance and invoices as early as the fall of 2016. (CSF ¶¶ 3, 6; *cf. id.* ¶¶ 23–28.) The parties then spent *months* trying to work through those concerns until Plaintiffs walked off the job in June 2017. (*Id.* ¶¶ 3, 6–16; *see also* Def.'s Br. Supp. Mot. Partial Summ. J., Doc. 164, at 3–7.) And HRT paid all amounts (hundreds of thousands of dollars) that it believed were legitimately undisputed. (CSF ¶ 10.)

Regardless of HRT's contractual right to formally "notify [Plaintiffs] of any invoices disputed in good faith within twenty (20) days of receipt" (MSA, Doc. 126-4, § 5.2), Plaintiffs were well aware of the parties' disputes, with or without formal notice. Indeed, Plaintiffs' other claims rely almost entirely on the parties' good-faith (though unsuccessful) attempts at informal dispute resolution under the MSA. (*Cf. id.* § 8.1 (calling for "Informal Dispute Resolution" by the parties' "executive officers").) Plaintiffs' argument that "HRT has waived its right to dispute Plaintiffs' invoices" thus ignores an *admitted* factual "dispute [over] whether [HRT] satisfied the timely notice requirement during the ME Project." (Pls.' MSJ Br., Doc. 167, at 14; *cf.* CSF ¶¶ 6, 23–28.) Plaintiffs' argument is also utterly inconsistent with the parties' actual conduct—not to mention the fact that it was difficult and time-consuming to ferret out Plaintiffs' improper billing in the first place (CSF ¶ 6; *cf.* Pls.' MSJ Br., Doc. 167, at 13 (conceding that Plaintiffs' invoices were sufficient to explain their charges in "admittedly *not* all" instances (emphasis added))). *See generally Salem Realty Co. v. Batson*, 256 N.C. 298, 308, 123 S.E.2d 744, 751 (1962) ("The acceptance of work which has been defectively done, the defects being unknown and not discoverable by inspection, does not amount to a waiver of the imperfect performance.").

Plaintiffs' waiver argument is also inconsistent with governing North Carolina law. If *anybody* waived a contractual right in this context, it was *Plaintiffs*, who waived any potential violations of the MSA's formal notice provisions. "[T]he parties may waive or excuse non-

occurrence of or delay in the performance of a contractual duty." *Dishner Developers, Inc. v. Brown*, 145 N.C. App. 375, 378, 549 S.E.2d 904, 906 (2001) (citing *Fletcher v. Jones*, 314 N.C. 389, 395, 333 S.E.2d 731, 735–36 (1985)), *aff'd*, 354 N.C. 569, 557 S.E.2d 528 (2001). "The basis for a waiver can be inferred from conduct or expressed in words." *Fletcher*, 314 N.C. at 394, 333 S.E.2d at 735. And North Carolina courts have held that "conduct such as continuing performance with knowledge that [a contractual] condition has not occurred"—as in the context of a passing deadline—can be "sufficient for waiver." *Id.* (internal brackets and quotation marks omitted); *accord Ball*, 184 N.C. App. at 104, 645 S.E.2d at 894; *Dishner Developers*, 145 N.C. App. at 378, 549 S.E.2d at 906; *cf. 42 E., LLC v. D.R. Horton, Inc.*, 218 N.C. App. 503, 509, 722 S.E.2d 1, 5 (2012) (noting that even a "time is of the essence" clause can be waived). "The mere fact that the nonbreaching party elects to continue performance or accept performance is enough to trigger the waiver." *Wheeler v. Wheeler*, 299 N.C. 633, 640, 263 S.E.2d 763, 767 (1980).

Here, Plaintiffs *knew* about the MSA's 20-day notice provision and *chose* to continue performing for months after HRT began disputing their invoices and issuing what Plaintiffs contend were incomplete payments. (*See, e.g.*, CSF ¶ 7.) In fact, Plaintiffs' own claims depend heavily on the invoice review in March and April of 2017, when Plaintiffs proposed reductions to their November–February invoices, long after any 20-day window had expired. (*Id.* ¶¶ 8–9).

The same reasoning applies to HRT's supposed obligation to notify Plaintiffs of "material non-conformities with the Specifications in any of the Deliverables" (Pls.' MSJ Br., Doc. 167, at 14). Insofar as Plaintiffs now argue that they did not receive adequate notice of billing disputes or HRT's concerns about Plaintiffs' "Deliverables," there is *at least* a genuine dispute of material fact as to whether Plaintiffs waived any requirement of formal written notice under the MSA.

Furthermore, even if Plaintiffs were hypothetically entitled to summary judgment with

respect to *liability* (though they are not), Plaintiffs still could not prove *damages* to the degree of certainty required for the Court to award "the full measure of damages on their claims" (Pls.' MSJ Br., Doc. 167, at 7) in a summary judgment. HRT has identified genuine disputes of material fact with respect to Plaintiffs' improper billing practices on the ME Project. (*See, e.g.*, CSF ¶¶ 3, 6, 13, 23–37.) Regardless of whether HRT ultimately prevails on its affirmative counterclaims, Plaintiffs are not entitled to recover damages for work that they did not perform or for amounts that they were not permitted to bill under the parties' contract. On this point, Plaintiffs' mischaracterizations of Jef Wallace's 30(b)(6) testimony (*see* Pls.' MSJ Br., Doc. 167, at 14) are unavailing. Wallace agreed only that the parties' contract contemplated variable fees in some circumstances—not that Plaintiffs could ignore the contract's fixed fees altogether and charge HRT whatever they wanted (*see* CSF ¶ 14). Reasonable jurors could conclude that Plaintiffs are not entitled to *all* amounts that they seek for "outstanding invoices" and speculative "unrealized profits" (Pls.' MSJ Br., Doc. 167, at 15)—especially not unearned "profits" from work that Plaintiffs themselves *chose* not to do by abandoning the Project. *See Iron Steamer, Ltd. v. Trinity Rest., Inc.*, 110 N.C. App. 843, 847, 431 S.E.2d 767, 770 (1993) ("In order to recover damages for lost profits, the complainant must prove that except for the breach of contract, profits would have been realized, and he must ascertain such losses with 'reasonable certainty.' North Carolina courts have long held that damages for lost profits will not be awarded based upon hypothetical or speculative forecasts of losses." (internal citations omitted)).[2]

---

[2] Plaintiffs' speculative calculation of "unrealized profits" is based solely on the say-so of their summary-judgment declarant Rob Carbone, without further evidentiary support. (Pls.' MSJ Br., Doc. 167, at 15.) During his testimony as Plaintiffs' designated 30(b)(6) representative, however, Carbone had no specific understanding of any damages sought beyond the amounts in Plaintiffs' unpaid invoices. (Sharpe Ex. 7, Carbone Dep. 255:14–256:9, 262:19–263:19.)

### 2. Plaintiffs' attacks on HRT's contract claim fail to show an absence of genuine factual disputes related to Plaintiffs' poor performance and improper billing.

Plaintiffs' motion should also be denied with respect to HRT's counterclaim for breach of contract. "It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the [counterclaim] plaintiff has no evidence to prove his case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986) (White, J., concurring). And Plaintiffs' conclusory assertion that "HRT has failed to obtain or disclose any facts to support its bald allegations of breach by Plaintiffs" (Pls.' MSJ Br., Doc. 167, at 13) is wrong.

HRT has not moved for summary judgment on its own contractual claim, but it is beyond dispute that Plaintiffs improperly billed HRT for at least *some* travel time that they reclassified as "labor" hours. (CSF ¶ 28.) Plaintiffs also concede that performance "issues did arise from time to time with certain technicians" and that "problems arose at certain locations" on Plaintiffs' watch. (Pls.' MSJ Br., Doc. 167, at 3.) Indeed, evidence of the numerous problems that HRT identified with Plaintiffs' performance and invoices is more than sufficient to defeat Plaintiffs' request for summary judgment on HRT's counterclaim for breach of contract. (*See* CSF ¶¶ 3, 6, 23–28.)

The Court should not be persuaded by Plaintiffs' attempt to support their summary-judgment motion by re-litigating old discovery disputes over information about specific ME franchise locations. (*See* Pls.' MSJ Br., Doc. 167, at 15–16.) For examples of information about store-specific concerns, beyond those identified in HRT's interrogatory responses (*see generally* CSF ¶¶ 23–28), the Court need look no further than the previously filed reports of HRT's experts, Bruce Webster (Doc. 126-2) and Leanne Gould (Doc. 126-3). Webster and Gould reviewed, analyzed, and summarized voluminous materials documenting specific performance and billing issues at *many* individual ME clinic locations. (*See, e.g.*, Webster Report, Doc. 126-2, at 38–39, 40 ("Exhibit 6: Questionable/Suspicious Billings," "Exhibit 7: Duplicate P4

Invoices"); Gould Report, Doc. 126-3, Sub-Schedules (breaking down analysis by ME clinic number).) Plaintiffs' assertion that "HRT has no facts to support its allegations that Plaintiffs breached the contract" (Pls.' MSJ Br., Doc. 167, at 15) is simply untrue.

> ### 3. Plaintiffs' claim for account stated (Count II) fails as a matter of law.

As HRT argued in support of its motion for partial summary judgment (Doc. 164, at 9–11), Plaintiffs' claim for account stated is fatally flawed. Plaintiffs cannot prove—and certainly cannot show with undisputed material facts—that HRT ever acknowledged the correctness of Plaintiffs' invoice adjustments or agreed to pay the remaining amounts without further dispute. If the Court does not grant summary judgment *for HRT* on this claim, "[i]t is a jury question as to whether the defendant by the retention of the statement of the account agreed that it was correct and agreed to pay it." *Mahaffey v. Sodero*, 38 N.C. App. 349, 351, 247 S.E.2d 772, 774 (1978).

> ## B. Plaintiffs Are Not Entitled to Summary Judgment on Their Remaining Claims for Misrepresentation and Deceptive Trade Practices.

> ### 1. Plaintiffs' tort claims fail as a matter of law.

As HRT's argued in support of its motion for partial summary judgment, Plaintiffs' claims for misrepresentation and deceptive trade practices fail as a matter of North Carolina law. (Doc. 164, at 11–19.) Given the undisputed existence of a binding contract (*see, e.g.*, Pls.' MSJ Br., Doc. 167, at 13 ("The parties do not dispute the validity of the MSA and SOW.")), Plaintiffs cannot prevail on their tort claims without "identify[ing] a [tort] duty . . . 'separate and distinct from any duty owed under [the] contract.'" *Forest2Market, Inc. v. Arcogent, Inc.*, No. 15 CVS 9547, 2016 WL 56279, at *3 (N.C. Super. Ct. Jan. 5, 2016) (quoting *Kelly v. Ga.-Pac. LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009)). In addition, Plaintiffs' claim for deceptive trade practices requires further proof of "substantial aggravating circumstances." *Id.* at *5 (quoting *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992)). As plainly

demonstrated in the *Forest2Market* case applying North Carolina's economic-loss rule to dismiss similar claims in another case involving IT upgrades, Plaintiffs cannot make the showing necessary for their tort claims to survive *HRT's* motion for summary judgment—much less the showing that would be necessary to prevail on their own request for judgment as a matter of law.

Nor can Plaintiffs' prove other key elements of their claims for misrepresentation and deceptive trade practices, such as reasonable reliance. Both of Plaintiffs' tort claims depend on their insistence that Plaintiff "Sitehands *reasonably* relied on the [alleged] false promises by HRT that it would pay . . . and would stay current with its payments moving forward." (Pls.' MSJ Br., Doc. 167, at 1 (emphasis added).) But Plaintiffs were sophisticated businesses that had negotiated contractual protections and willingly entered into attempted settlement negotiations— all while continuing to perform and send invoices for new charges to a business partner that was already withholding payment. No reasonable juror could find that Plaintiffs' supposed reliance was reasonable in those circumstances. *See Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 454–56, 461, 400 S.E.2d 476, 478–479, 482 (1991) (affirming summary judgment dismissing claims for fraud and deceptive trade practices because of a lack of reasonable reliance).

2.    **Even if Plaintiffs' tort claims were not barred as a matter of law, genuine disputes of material fact would preclude a summary judgment in their favor.**

Plaintiffs' claims for misrepresentation and deceptive trade practices are both based on an email in which HRT employee Bob Fletcher supposedly "told Plaintiffs" that he would "be the one that certifies payment" during the parties' review of Plaintiffs' invoices in the spring of 2017, when the parties failed to reach a final settlement of their disputes. (Pls.' MSJ Br., Doc. 167, at 19–20.) Plaintiffs contend that they interpreted Fletcher's email as a representation *by HRT* that he had authority to bind HRT to pay certain amounts in partial settlement of the parties' billing disputes, and that Plaintiff Sitehands continued to perform its contractual obligations in reliance

on that allegedly false representation. (*See id.* at 19, 22–23.)

Even if this theory did not fail as a matter of law, Plaintiffs would not be entitled to summary judgment on their tort claims. For one thing, Plaintiffs' own representative during the invoice review says that Plaintiffs relied only on HRT's commitment to negotiate in good faith (CSF ¶ 12)—a commitment that HRT fulfilled (*id.* ¶¶ 7–12). Moreover, Bob Fletcher did *not* in fact have authority to bind HRT to any payment plan or other settlement agreement. (*Id.* ¶ 8; *see also* Def.'s Br. Supp. Mot. Partial Summ. J., Doc. 164, at 4–7.) To the extent that Plaintiffs claim to have relied on Fletcher's *apparent* authority to bind HRT as its agent, "[a]n agent's authority to bind his principal *cannot be shown by the agent's acts or declarations*. This can be shown only by proof that *the principal* authorized the acts to be done or that, after they were done, he ratified them." *Simmons v. Morton*, 1 N.C. App. 308, 310, 161 S.E.2d 222, 223 (1968) (emphasis added) (internal quotation marks omitted). Additionally, HRT's Chairman Steve Koura had entered into the negotiations by late April and expressly stated his sole authority to deal by May 12, 2017 (CSF ¶ 8), even while Plaintiffs continued to work on the Project for another month after that (*id.* ¶ 11). At the very least, there are genuine factual disputes about the scope of Fletcher's authority (if any) and the reasonableness (or not) of Plaintiffs' supposed reliance on his representations.

## C. Plaintiffs Are Not Entitled to Summary Judgment on HRT's Non-Contractual Claims for Misrepresentation, Deceptive Trade Practices, and RICO Violations.

### 1. There are genuine disputes of material fact related to Plaintiffs' scheme of improper and deceptive billing practices with respect to HRT and nonparties.

As shown above, it cannot be reasonably disputed that Plaintiffs improperly billed HRT for travel time that they had reclassified as "labor" hours. (CSF ¶ 28.) In addition to Plaintiffs' pattern of misbehavior and poor performance with respect to HRT, there is also evidence that Plaintiffs engaged in a similarly fraudulent scheme with their other customers, including

JPMorgan Chase. (*Id.* ¶ 29.) Even if Plaintiffs dispute these facts, or deny their fraudulent intent, the evidence is sufficient to defeat their motion for summary judgment on HRT's tort claims.

As one North Carolina court explained in refusing to grant summary judgment on claims for fraud and deceptive trade practices under North Carolina law, "Where there are disputed facts impacting questions such as reasonable reliance and materiality, summary judgment is not appropriate." *Bank of Am. Corp. v. SR Int'l Bus. Ins. Co., SE*, No. 05 CVS 5564, 2007 WL 4480057, at *18 (N.C. Super. Ct. Dec. 19, 2007).[3] And unlike Plaintiffs' tort claims, for which they contend only that they were induced to perform their *existing* obligations under a written contract, HRT's tort claims are premised on Plaintiffs' intentional false billing of amounts that HRT *would never have owed* under the parties' agreement. Plaintiffs cannot hide behind a contract to engage in fraud or deceptive trade practices in these aggravating circumstances.

Plaintiffs' request for judgment as a matter of law on HRT's RICO claim should be denied for similar reasons. Their summary-judgment brief reiterates many of the same arguments that Judge Cayer has already rejected in recommending the denial of Plaintiffs' motion to dismiss HRT's RICO claim. (*See* HRT Opp'n, Doc. 112; Mem. & Recommendation, Doc. 132.) These recycled arguments are no more persuasive now than they were when Judge Cayer rejected them. And although Plaintiffs attempt to undermine the testimony of their former employee Behz Akhund (Pls.' MSJ Br., Doc. 167, at 25), the fact remains that he has testified that he was ordered by Plaintiffs' senior personnel to reclassify travel time as labor hours so that Plaintiffs could overbill JPMorgan Chase in the same way that they overbilled HRT. (CSF ¶¶ 28–30.)

_____

[3] North Carolina courts apply the same familiar summary-judgment standard as federal courts. *See* N.C. R. Civ. P. 56(c) (permitting summary judgment when "there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law"), *quoted in Bank of Am.*, 2007 WL 4480057, at *10.

### 2. Documents with facts that may be essential to support HRT's counterclaims have not yet been produced under the Court's recent discovery order.

Granting Plaintiffs' motion for summary judgment on HRT's non-contractual counterclaims would also be inappropriate because there are facts as yet undiscovered (through no fault of HRT's) that may be "essential to justify [HRT's] opposition." Fed. R. Civ. P. 56(d). HRT is still waiting for Plaintiffs and two of Plaintiffs' nonparty subcontractors to produce documents in accordance with the Court's most recent discovery order.

Despite Judge Cayer's report and recommendation denying Plaintiffs' motion to dismiss HRT's RICO claim (Doc. 132), Plaintiffs have stubbornly refused to produce records concerning their relationship and billing issues with other clients such as JPMorgan Chase and Bank of America. (McCarter Rule 56(d) Decl. ¶ 3.) HRT thus filed a renewed motion to compel the production of those documents at the close of discovery (Doc. 145), and the Court granted that motion in part on January 24, 2020, concluding that "[*t*]*his information is relevant* to Defendant's RICO Counterclaim" (Doc. 162, at 1 (emphasis added)). Given their pending objection to Judge Cayer's recommendation on their motion to dismiss, however, the Court allowed Plaintiffs to delay the production of those documents until 15 days after the District Judge's "denial of Plaintiffs' Motion to Dismiss the RICO Counterclaim." (*Id.* at 2.) The Court has not yet ruled on Plaintiffs' objection to Judge Cayer's recommendation, and those documents have still not been produced. (McCarter Rule 56(d) Decl. ¶ 5.)

Additionally, the Court's January 24, 2020 discovery order (Doc. 162) granted HRT's motion to compel the production of documents from two of Plaintiffs' nonparty subcontractors. (Doc. 146). HRT sought those documents to obtain additional evidence of "Plaintiffs' scheme to defraud HRT and other customers" by "instructing their own subcontractors to bill travel time as 'labor' so that they could, in turn, inflate the invoices they submitted to HRT." (Doc. 146-1,

Def.'s Mem. Supp. Mot. Compel, ¶¶ 1, 2.) Those concerns are directly relevant not only to HRT's RICO claim but also to its other non-contractual counterclaims, for misrepresentation and deceptive trade practices. Although HRT promptly notified both of the subcontractors at issue of the Court's order granting HRT's motion to compel, neither of them has completed their document production under the Court's order. (McCarter Rule 56(d) Decl. ¶¶ 8–10.)

"A Rule 56(d) motion must be granted 'where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483–84 (4th Cir. 2014) (quoting *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002)).[4] "Such a request is 'broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.'" *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013) (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010)). The Court should therefore deny or defer ruling on Plaintiffs' motion for summary judgment on HRT's tort claims for this reason alone.

### III. CONCLUSION

For the reasons given above and in support of HRT's motion for partial summary judgment, Plaintiffs' motion should be denied in full.

---

[4] This is not a case in which HRT "had the opportunity to discover evidence but chose not to" or where the "inability to gather evidence was due to [HRT's] own delay." *McCray*, 741 F.3d at 484 (holding that district court's denial of relief under Rule 56(d) was an abuse of discretion). HRT sought discovery on these issues for *months* before the Court's January 2020 order compelled the production of responsive documents. (*See, e.g.*, Def.'s July 2019 Mot. Compel, Doc. 81.)

Respectfully submitted this 10th day of February 2020.

/s/ *Jason S. McCarter*

Jason S. McCarter, NC Bar No. 28371
Lee Peifer, *Pro Hac Vice*
John Sharpe, *Pro Hac Vice*
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree St., NE, Suite 2300
Atlanta, GA 30309-3996
(404) 853-8000 (t)
(404) 853-8806 (f)
JasonMcCarter@eversheds-sutherland.com
LeePeifer@eversheds-sutherland.com
JohnSharpe@eversheds-sutherland.com

James C. Smith, NC Bar No. 8510
NEXSEN PRUET, PLLC
227 W Trade St #1500
Charlotte, NC 28202
(704) 339-0304 (t)
(704) 338-5377 (f)
JSmith@nexsenpruet.com

*Attorneys for Horizon River Technologies, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have this day electronically filed the foregoing **Defendant's**

**Response in Opposition to Plaintiffs' Motion for Summary Judgment** with the Clerk of Court

using the CM/ECF e-filing system, which will send notification to all counsel of record.

Dated this 10th day of February 2020.

/s/ *Jason S. McCarter*
Jason S. McCarter