# EXHIBIT 5

```
         IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                    CHARLOTTE DIVISION


   CS TECHNOLOGY, INC.,      )
   and SITEHANDS, INC.,      )
                             )  Videotaped Deposition of:
        Plaintiffs,          )
                             )  Bruce Webster
   vs.                       )
                             )
   HORIZON RIVER             )
   TECHNOLOGIES, LLC,        )  Case No. 3:18-CV-00273
                             )
        Defendant.           )


              January 3, 2020 * 9:30 a.m.

   Location:  Salt Lake Marriott Downtown at City Creek
              75 South West Temple
              Salt Lake City, Utah  84101


           Reporter:  Diana Kent, RPR, CRR
      Notary Public in and for the State of Utah
          Videographer:  Ryan Reverman, CLVS
```

1    A.    Those are the rates listed here on this
2    rate card.
3    Q.    And you have no reason to dispute that
4    those are the rates that apply to this contract, right?
5    A.    Well, they apply for move, add, change
6    work.  I don't know if they apply to P-4 work.
7    Q.    You don't know one way or the other?
8    A.    Again, my interpretation of P-4 is it's a
9    fixed price, so that's going to be a financial decision
10   on the part of CST Sitehands as to who they put on
11   those jobs and how quickly they can get it done.
12   Q.    Now, in paragraph 17 of your report --
13   before I get to 17, let me just go in sequential order
14   here.  In paragraph 15 you again refer to the cost for
15   the P-4 installations as being fixed fee.  Do you see
16   that?
17   A.    I do.
18   Q.    Okay.  And again, you don't put in
19   paragraph 15 any exception or qualification for other
20   acceptable charges under the contract, do you?
21   A.    No, I don't.
22   Q.    And then in paragraph 17 you describe that
23   plaintiffs struggled with the installation when work
24   began in August of 2016.  Do you see that?
25   A.    Yes.

1     Q.    And that's based off your interpretation
2    of the documents that you read?
3     A.    Yes.
4     Q.    And then you go on to describe in the next
5    couple of paragraphs the installation checklist that
6    HRT had put together for the installation, correct?
7     A.    Yeah.  I start -- 16 through 19 talks
8    about it, yes.
9     Q.    Yeah.  And a steadily increasingly
10   detailed installation checklist provided by HRT,
11   correct?
12    A.    Yes.
13    Q.    And that was -- it was HRT's obligated
14   responsibility under the SOW to provide that checklist,
15   correct?
16    A.    Yes.
17    Q.    And so now in paragraph 19 you state that
18   in December of 2016, there were ongoing problems with
19   plaintiffs' performance of the P-4 installations.  Do
20   you see that?
21    A.    Yes.
22    Q.    And again, that was based on your review
23   of the documents that you read, correct?
24    A.    Yes.
25    Q.    Now, are you aware that during the

```
 1   installation and then the second to do the cut-over.
 2   Did you have any knowledge of that prior to today?
 3              MR. SHARPE:  Object to the form.
 4        A.    Well, I'm confused because basically that
 5   was implemented with CST as of December of 2016, so I'm
 6   not sure why they would go back to Massage Envy after
 7   they are already doing it.  They've been doing it for
 8   months by the time -- the timeframe you're talking
 9   about.
10        Q.    And HRT went back and negotiated that
11   change to its contract with Massage Envy.  You weren't
12   aware of that prior to today?
13        A.    I wasn't aware that it was even an issue,
14   since HRT implemented a two-visit approach in December
15   of 2016.
16        Q.    And in paragraph 20 of your report you say
17   that, "HRT continued to have serious problems with the
18   quality and reliability of plaintiffs' installations,
19   receiving complaints from Massage Envy franchisees and
20   executives."  And then you cite to a bunch of exhibits.
21   Correct?
22        A.    Uh-huh (affirmative).
23        Q.    And is it the opinion that you offer here,
24   that HRT continued to have serious problems with the
25   quality and reliability of plaintiffs' installations,
```

1 based on your review of the documents?
2      A.   From the document I've seen, yes.
3      Q.   Okay.  And it's based on your
4 interpretation of what you've read in those documents
5 to allow you to give that opinion?
6      A.   It's based on the actual complaints from
7 the franchisees in the documents that I've read, yes.
8      Q.   Okay.  Is there anything technical about
9 the complaints from the franchisees that requires you
10 to apply your expertise to determine that HRT was
11 having serious problems with the quality and
12 reliability of plaintiffs' installations?
13      A.   The problems described in many of these
14 complaints are, in fact, technical problems with things
15 not functioning and things not working.  And, yeah,
16 it's the difference between saying air is low in one
17 tire or my wheel has fallen off as a technical
18 evaluation as far as the nature of the complaints.
19           In other words, if the complaints involved
20 appear to be, from a technical point of view, minor
21 complaints that are not significant; if, from a
22 technical point of view, they appear to be serious
23 complaints that are actually impacting the functioning
24 of the Massage Envy site, then yes, they are serious.
25      Q.   Yeah.  So if a franchisee writes a

```
 1   breached any contractual obligation to HRT under the
 2   MSA or SOW?
 3        A.   No.
 4        Q.   No.  Okay.  Did you, in the course of
 5   preparing your report and providing the opinions stated
 6   therein, make any effort to determine on a site-by-site
 7   basis whether and how much CST and Sitehands overbilled
 8   the plaintiffs?  I'm sorry.  Overbilled HRT?
 9        A.   No.  We didn't --
10        Q.   Okay.
11        A.   -- make an attempt to quantify that.
12        Q.   Okay.  And you never broke down on a
13   store-by-store location the amount that you believe CST
14   and Sitehands may have overbilled HRT for any
15   particular work that was done, did you?
16        A.   Actually, we did do some of that analysis,
17   and that's cited back in Section 5.4.
18        Q.   Right.  But there's --
19        A.   We are looking, and this is all on a
20   site-by-site basis.  Here are things that we found.
21   Billing amounts that don't appear to be justified by
22   the amount of work done, or billing amounts where the
23   hours billed greatly exceeds the actual complexity of
24   the task at hand.
25        Q.   Right.  But did you identify the specific
```

1   locations, in your report, that you believe this
2   occurred or did you just aggregate the total number?
3        A.    I think we specifically identified them.
4              Yeah.  Exhibit 6 has questionable/
5   suspicious billings, and we identify all of the sites.
6        Q.    Okay.
7        A.    And likewise for the apparent duplicate
8   P-4 invoices, we identify all the sites.
9        Q.    Okay.  So other than what's contained in
10  Exhibit 6 and Exhibit 5, you didn't do any further
11  analysis on a site-by-site location; is that fair?
12       A.    Well, we did analysis of -- gosh, how many
13  sites was it in all?  We did site-by-site analysis for
14  half of the sites, basically.
15       Q.    No, no.
16       A.    So what I'm saying here is --
17       Q.    Let's go back to my question.
18       A.    -- these are ones where, simply based on
19  what was written in the invoices, there were clear
20  problems for us.  And that's what we did here.
21       Q.    Understood.
22       A.    Okay.
23       Q.    And again --
24       A.    So maybe I'm misunderstanding your
25  question.