# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:18-cv-00273-RJC-DSC

| | | |
|---|---|---|
| CS TECHNOLOGY, INC. and SITEHANDS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| HORIZON RIVER TECHNOLOGIES, LLC, | ) ) ) | |
| Defendant. | ) ) | |

**THIS MATTER** comes before the Court on Defendant's motion for partial summary judgment, (Doc. No. 163), Plaintiffs' motion for summary judgment, (Doc. No. 166), and Plaintiffs' motion to strike, (Doc. No. 124).

## I.     BACKGROUND

Plaintiffs CS Technology, Inc. ("CS Technology") and Sitehands, Inc. ("Sitehands") provide IT infrastructure management and delivery services. Defendant Horizon River Technologies, LLC ("Horizon") is a technology services company whose clients have geographically dispersed offices or franchises. One such client was Massage Envy Franchising, LLC ("Massage Envy"). Massage Envy sought to update its IT infrastructure in its clinics across the United States (the "Project"). On or about July 15, 2016, Horizon and Massage Envy entered into an agreement under which Horizon was to plan and oversee the Project and perform certain on-site work. (See Doc. No. 92, ¶ 20; Doc. No. 238, ¶ 20.)

Around the same time that Horizon and Massage Envy entered into their

agreement, Horizon and CS Technology executed a Master Services Agreement ("MSA"). (Doc. No. 171.) Under the MSA, CS Technology agreed to provide services to Horizon pursuant to the terms and conditions of the MSA and one or more separate Statements of Work, and Horizon agreed to pay CS Technology for those services as set forth in the applicable Statement of Work. (Doc. No. 171, §§ 1.1, 5.1.) Under section 5.2 of the MSA, CS Technology was to mail monthly invoices to Horizon for payment, and Horizon agreed to pay "correct invoices" within thirty days of receipt. Horizon was to notify CS Technology "of any invoices disputed in good faith within twenty (20) days of receipt and pay the undisputed portion of such invoice." (Doc. No. 171, § 5.2.) The MSA also contained the following informal dispute resolution procedure:

> If any disagreement or dispute arises between the parties, the executive officers of [Horizon] and [CS Technology] (or their respective designated alternates with appropriate responsibility for this Agreement and/or the applicable Statement of Work, together the "Contract Executives") shall, within seven (7) business days of receipt of notice of such disputed matter, attempt in good faith to resolve such disagreement or other dispute.

(Doc. No. 171, § 8.1.)

On August 3, 2016, Horizon and CS Technology executed a Statement of Work ("SOW") under which Horizon subcontracted its IT infrastructure work for the Project to CS Technology. (Doc. No. 172.) Under the SOW, CS Technology was to perform three categories of work: (1) break/fix work, which consisted of sending field technicians to fix various issues; (2) installation of the network equipment at new Massage Envy clinics, referred to as "new site buildouts"; and (3) installation of the

2

network equipment at existing Massage Envy clinics, referred to as "P4 installs." (Doc. No. 215-2, at 208:18–23; Doc. No. 215-3, at 155:8–11; Doc. No. 215-8, at 211:12–23; see Doc. No. 172.) The SOW provided hourly rates for break/fix work and a fee of $11,465 per new site buildout. (Doc. No. 172, at 5.) With respect to P4 installs, the SOW provided that 7-foot patch cords and 100-foot "CAT6 cabling" would be used, and Horizon was to pay CS Technology a fee of $689.25 per site. (Doc. No. 172, at 4.) After executing the SOW, however, there was a change to color cabling and the P4 install fee was increased to $748.42 per site. (Doc. No. 195, at 60:24–61:3; Doc. No. 215-2, at 89:19–25.) The SOW provided that Horizon would be responsible for additional costs above the $748.42 P4 install fee in certain circumstances. For example, the SOW stated that "[c]eiling height over 9 feet or hard ceiling may result in additional cost for labor and ladder lift." (Doc. No. 172, § 3.4.) In addition, Horizon was to pay a $140 site rescheduling fee if CS Technology's technician was turned away and not permitted to complete the installation or if the technician was unable to complete the installation due to environmental issues. (Doc. No. 172, §§ 4.3–4.4.) The $748.42 fee for P4 installs expressly included technician travel time. (Doc. No. 172, § 6.2.) CS Technology assigned the MSA and SOW to Sitehands in December 2016. (Doc. No. 92, ¶ 5; Doc. No. 238, ¶ 5.)

Horizon and CS Technology began work on the Project in August 2016. (Doc. No. 92, ¶ 39; Doc. No. 238, ¶ 39.) From August through October 2016, CS Technology sent to Horizon monthly invoices totaling $32,853.55, $52,528.95, and $33,088.96, respectively. (Doc. No. 1, ¶ 27; Doc. No. 10, ¶ 27.) Horizon paid those invoices in full.

3

(Doc. No. 1, ¶ 3; Doc. No. 10, ¶ 3.)

From November 2016 through January 2017, Plaintiffs sent to Horizon monthly invoices totaling $72,639.71, $48,385.06, and $137,585.64, respectively. (Doc. No. 175, at SITEHANDS_0151760, 0151756, 0151758.) Horizon disputed those invoices but made a payment of approximately $122,551 in January 2017 towards the outstanding invoices. (Doc. No. 1, ¶ 29; Doc. No. 10, ¶ 29.) Thereafter, Sitehands sent to Horizon monthly invoices for February and March 2017 totaling $77,697.08 and $191,781.33, respectively. (Doc. No. 175, at SITEHANDS_0110237, 0151773.) Horizon also disputed those invoices.

In March and April 2017, the parties agreed to engage in informal dispute resolution with the hope of resolving the disputed invoices from November 2016 through March 2017. (Doc. No. 92, ¶ 87; Doc. No. 238, ¶ 5; Doc. No. 214, ¶¶ 14–15.) Mike Murphy participated on behalf of Plaintiffs, and Bob Fletcher participated on behalf of Horizon. (Doc. No. 170, ¶ 5.) Murphy and Fletcher had three to five phone calls that totaled approximately thirteen to fifteen hours during which Murphy shared via WebEx a spreadsheet that contained line items for the Massage Envy clinic, the work performed at the clinic, and the labor hours. (Doc. No. 224, at 51:19–53:3.) During the invoice review, Horizon disputed Plaintiffs' invoiced charges for new site buildouts, P4 installs, and break/fix work. (Doc. No. 1, ¶¶ 33, 38; Doc. No. 10, ¶¶ 33, 38.)

On April 28, 2017, Murphy sent an email to Fletcher summarizing what Murphy believed to be the outcome of their invoice review. (Doc. No. 226.) Murphy

4

stated that of the total amount invoiced from November 2016 through March 2017, $471,826.23 was "approved" and $68,134.40 remained under dispute. (Doc. No. 226.) The next day, Frank Favia, CS Technology's Chief Financial Officer, emailed a similar summary to Steve Koura, Horizon's Chairman and Managing Partner. (Doc. No. 181.) Favia stated that of the total amount invoiced from November 2016 through February 2017, $68,029.26 was no longer in dispute and was due immediately. (Doc. No. 181.) Favia further stated that of the amount invoiced in March 2017, $181,884.59 was no longer in dispute and was due on May 12, 2017. (Doc. No. 181.)

In April and May 2017, Horizon made three payments to Plaintiffs totaling $311,254.83. (Doc. No. 1, ¶ 44; Doc. No. 10, ¶ 44.) Horizon disputed, however, that $471,826.23 of the total amount invoiced from November 2016 through March 2017 was no longer in dispute. (Doc. No. 183, at HRT_0123162, 0123166; Doc. No. 186, at SITEHANDS_0078715; Doc. No. 216-4, at SITEHANDS_0000073.) Horizon requested detailed information on the amounts charged in an attempt to resolve the disputed invoices, while Plaintiffs insisted that an agreement had already been reached. (Doc. No. 183, at HRT_0123162–63, 0123165–66.) Plaintiffs continued to send monthly invoices to Horizon from April 2017 through July 2017, but Horizon failed to pay those invoices in full and continued to dispute certain charges. (Doc. No. 175, at SITEHANDS_0133375, 0151775, 0151771, 0157545.)

By letter dated June 12, 2017, Sitehands suspended its services under the MSA and SOW due to the outstanding invoices. (Doc. No. 191.) Over the course of the Project, Plaintiffs sent invoices to Horizon totaling $1,636,409.16, and Horizon paid

Plaintiffs $555,277.85.  (Doc. No. 210, ¶ 15; <u>see</u> Doc. No. 175.)

On May 25, 2018, Plaintiffs filed their complaint against Horizon asserting claims for (1) breach of contract, (2) account stated, (3) fraud and negligent misrepresentation, and (4) unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1.  (Doc. No. 1, at 14–17.)  Horizon asserted counterclaims against Plaintiffs for (1) breach of contract, (2) fraud, (3) negligent misrepresentation, and (4) unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1.[1]  (Doc. No. 92, at 29–32.)  Plaintiffs filed their motion to strike on October 30, 2019, and the parties filed their motions for summary judgment on January 27, 2020.  The motions have been fully briefed and are now ripe for adjudication.[2]

## II.   MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs move for summary judgment on all claims and counterclaims. Horizon moves for summary judgment on Plaintiffs' claims, save and except for Plaintiffs' breach of contract claim.

### A.   Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

---

[1] Horizon also asserted a counterclaim for violation of the Racketeer Influenced and Corrupt Organizations Act, which the Court dismissed by order dated February 21, 2020.  (Doc. No. 237.)

[2] Due to the COVID-19 global pandemic, the Court decides the motions without oral argument.

6

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quotation marks omitted). This "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The nonmoving party may not rely upon mere allegations or denials of allegations in the pleadings to defeat a motion for summary judgment; rather, it must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Id. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences therefrom in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. Anderson,

477 U.S. at 248–49. "If the evidence is merely colorable or is not significantly probative," summary judgment is appropriate. Id. at 249–50 (citations omitted).

## B. Account Stated

Plaintiffs and Horizon seek summary judgment on Plaintiffs' claim for an account stated.

"An account stated may be defined, broadly, as an agreement between the parties to an account based upon prior transactions between them, with respect to the correctness of the separate items composing the account, and the balance, if any, in favor of the one or the other." Mazda Motors of Am., Inc. v. Sw. Motors, Inc., 250 S.E.2d 250, 254 (N.C. 1979) (quotation marks omitted). "An account stated is a species of contract action, in which the plaintiff must prove that the defendant agreed to pay a specific account to the plaintiff." Frank M. McDermott, Ltd. v. Moretz, 898 F.2d 418, 421 (4th Cir. 1990). "To constitute a stated account there must be a balance struck and agreed upon as correct after examination and adjustment of the account." Nello L. Teer Co. v. Dickerson, Inc., 126 S.E.2d 500, 506 (N.C. 1962). In other words, "for an account stated to arise it is essential that there be an agreement between parties that an account rendered by one of them to the other is correct." Mazda Motors, 250 S.E.2d at 255 (quotation marks omitted); see also Nello L. Teer Co., 126 S.E.2d at 506 ("An account can only become an account stated by an admission of its correctness by the party charged, or by its receipt and failure to deny liability within a reasonable time."). "Once this agreement is made the account stated constitutes a new and independent cause of action superseding and merging the antecedent cause

8

of action." Mahaffey v. Sodero, 247 S.E.2d 772, 774 (N.C. Ct. App. 1978).

Plaintiffs contend that they are entitled to summary judgment on their account stated claim because the undisputed evidence demonstrates that pursuant to the invoice review meetings in March and April 2017, Plaintiffs and Horizon agreed that $471,826.23 of the amounts invoiced from November 2016 through March 2017 was undisputed and Horizon agreed to pay that amount but only paid $311,254.83. Horizon contends that it is entitled to summary judgment on Plaintiffs' account stated claim because there is no evidence that Horizon accepted Plaintiffs' statement of the account or otherwise agreed to pay a specific balance.

There are genuine disputes of material fact that prevent summary judgment in favor of any party. Plaintiffs submitted a declaration of Murphy in which he states that at the conclusion of the invoice review meetings, the parties agreed that of the total amount invoiced from November 2016 through March 2017, only $68,134.40 remained in dispute and Horizon would pay $471,826.23 towards those invoices. (Doc. No. 170, ¶ 15.) Plaintiffs make much about the fact that Fletcher stated in an email that he would be the one who "certifies payment." (Doc. No. 208.) Regardless of whether Fletcher had the authority to agree on behalf of Horizon to pay certain amounts or represented to Plaintiffs that he had such authority, Fletcher testified that he did not agree to anything with Murphy. (Doc. No. 224, at 58:10–11.) Fletcher testified that he and Murphy went through each line item on the spreadsheet and if the labor hours were higher than what Fletcher would expect for the specific work performed, Fletcher questioned Murphy about those hours to get more information.

9

(Doc. No. 224, at 52:23–53:13.) When Murphy did not have additional information or documentation, Fletcher assumed that Murphy was going to search for that information and would then provide it to Fletcher. (Doc. No. 224, at 56:18–22.) And when Plaintiffs emailed to Horizon their statement of what they understood to be the outcome of the invoice review meetings, Horizon disputed that statement and insisted that further discussions were needed to determine what remained under dispute. There is thus a genuine dispute of material fact as to whether Horizon agreed to pay $471,826.23 towards Plaintiffs' outstanding invoices from November 2016 through March 2017. Accordingly, the Court denies the parties' motions for summary judgment on Plaintiffs' account stated claim.

## C. Breach of Contract

Plaintiffs move for summary judgment on Horizon's breach of contract counterclaim and their breach of contract claim.

### 1. Horizon's Counterclaim

Horizon alleges that Plaintiffs breached the MSA and SOW by sending invoices to Horizon that were inconsistent with the parties' agreement and inadequately performing their contractual obligations.

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 530 S.E.2d 838, 845 (N.C. Ct. App. 2000). The parties agree that the MSA and SOW are valid and enforceable contracts. (Doc. No. 1, ¶ 59; Doc. No. 10, ¶ 59.) Plaintiffs argue that Horizon waived its right to dispute Plaintiffs' invoices because

10

it failed to comply with section 5.2 of the MSA, which required Horizon to notify Plaintiffs of any invoices disputed in good faith within twenty days of receipt. In response, Horizon argues that Plaintiffs waived any failure of Horizon to comply with the notification requirements of section 5.2.

"[T]he parties may waive or excuse non-occurrence of or delay in the performance of a contractual duty." Dishner Developers, Inc. v. Brown, 549 S.E.2d 904, 906 (N.C. Ct. App. 2001). As stated by the North Carolina Supreme Court:

> A waiver is sometimes defined to be an intentional relinquishment of a known right. The act must be voluntary and must indicate an intention or election to dispense with something of value or to forego some advantage which the party waiving it might at his option have insisted upon. The waiver of an agreement or of a stipulation or condition in a contract may be expressed or may arise from the acts and conduct of the party which would naturally and properly give rise to an inference that the party intended to waive the agreement. Where a person with full knowledge of all the essential facts dispenses with the performance of something which he has the right to exact, he therefore waives his rights to later insist upon a performance. A person may expressly dispense with the right by a declaration to that effect, or he may do so with the same result by conduct which naturally and justly leads the other party to believe that he has so dispensed with the right.

Guerry v. Am. Tr. Co., 68 S.E.2d 272, 274 (N.C. 1951). North Carolina courts have reiterated those principles in more recent decisions. E.g., Ball v. Maynard, 645 S.E.2d 890, 897–98 (N.C. Ct. App. 2007). Importantly, a party may still waive the performance of a contractual duty even when, as here, the contract contains an anti-waiver clause. 42 E., LLC v. D.R. Horton, Inc., 722 S.E.2d 1, 7 (N.C. Ct. App. 2012) ("The general view is that a party to a written contract can waive a provision of that contract by conduct expressly or surrounding performance, despite the existence of a so-called anti-waiver or failure to enforce clause in the contract. This is based on the

11

view that the nonwaiver clause itself, like any other term of the contract is subject to waiver by agreement or conduct during performance." (citation and quotation marks omitted) (quoting <u>ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.</u>, 245 P.3d 184, 196 n.8 (Utah 2010))). Whether or not subsequent conduct of the parties amounted to a waiver is generally a question of fact for the jury. <u>Id.</u>

There is a genuine dispute of material fact as to whether Plaintiffs waived any failure of Horizon to comply with the notification requirements of section 5.2 of the MSA. Plaintiffs contend that Horizon did not comply with those requirements throughout the Project. Nevertheless, when Plaintiffs and Horizon had meetings in March and April 2017 to review Plaintiffs' invoices from November 2016 through March 2017, Plaintiffs did not raise any issues regarding the timeliness of Horizon's disputes. (Doc. No. 214, ¶ 14.) In addition, there is no evidence that Plaintiffs objected to Horizon's untimely disputes at any other time. From that evidence, a reasonable juror could conclude that Plaintiffs waived any failure of Horizon to comply with the notification requirements of section 5.2. <u>See</u> <u>Guerry</u>, 68 S.E.2d at 274 ("Where a person with full knowledge of all the essential facts dispenses with the performance of something which he has the right to exact, he therefore waives his right to later insist upon a performance."). Accordingly, Plaintiffs are not entitled to summary judgment on Horizon's counterclaim for breach of contract on the basis that Horizon waived its right to dispute Plaintiffs' invoices.

Plaintiffs contend that they are nonetheless entitled to summary judgment on Horizon's counterclaim for breach of contract because Horizon has failed to come

12

forward with any evidence that Plaintiffs committed a breach. The Court concludes that there is at least one genuine dispute of material fact as to whether Plaintiffs breached the MSA and SOW so as to preclude summary judgment.

As discussed above, one of the categories of work Plaintiffs were to perform was new site buildouts, and the SOW provided a fee of $11,465 per site. Horizon contends, however, that the parties subsequently agreed that Plaintiffs would provide individualized quotes on a site-by-site basis for all new site buildouts.

"[P]rovisions of a written contract may be modified . . . by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract are modified . . . ." Inland Constr. Co. v. Cameron Park II, Ltd, 640 S.E.2d 415, 418 (N.C. Ct. App. 2007) (quoting Graham & Son, Inc. v. Bd. of Educ., 212 S.E.2d 542, 544–45 (N.C. Ct. App. 1975)). "This principle has been sustained even where the instrument provides for any modification of the contract to be in writing." 42 E., 722 S.E.2d at 7 (quoting Whitehurst v. FCX Fruit & Vegetable Serv., Inc., 32 S.E.2d 34, 39 (N.C. 1944)). As with the issue of whether the parties' subsequent conduct amounted to a waiver, whether the parties' subsequent conduct amounted to a modification is generally a question of fact for the jury. Id.

There is sufficient evidence from which a reasonable jury could conclude that the parties modified the SOW pricing for new site buildouts. The SOW contains a list of labor and materials that the parties anticipated would be required of every new site buildout, but ultimately that scope was not performed for every new site. (Doc. No. 215-2, at 235:6–236:3.) After the parties entered into the SOW, Plaintiffs referred

13

to the $11,465 fee as a "SWAG" number—an acronym for "stupid wild ass guess." (Doc. No. 215-11; Doc. No. 215:9, at 56:25–57:1.) There is evidence tending to show that Plaintiffs did not charge Horizon the $11,465 fee for all new site buildouts and instead prepared "bespoke quotes"—that is, quotes specific to the location of the new site. (Doc. No. 92, ¶ 5; Doc. No. 238, ¶ 5; Doc. No. 215-2, at 281:5–282:4; Doc. No. 215-9, at 57:6–18; Doc. No. 215-11; Doc. No. 216-9.)

Plaintiffs seem to contend that whatever the parties may have subsequently agreed to is immaterial to the indisputable pricing set forth in the SOW because any such subsequent agreement was not memorialized in a change order or written amendment to the SOW. (Doc. No. 230, at 6.) Plaintiffs' contention is not convincing for at least two reasons. First, as discussed above, the parties subsequently modified the P4 install fee from $689.25 to $748.42, and there is no evidence of a change order or written amendment memorializing that modification. Second, as stated earlier, "provisions of a written contract may be modified . . . by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract have been modified or waived, even though the instrument involved provides that only written modifications shall be binding." Son-Shine Grading, Inc. v. ADC Constr. Co., 315 S.E.2d 346, 349 (N.C. Ct. App. 1984).

Therefore, the Court concludes that there is a genuine dispute of material fact as to whether the parties modified the SOW's pricing for new site buildouts and, as a result, there is a genuine dispute of material fact as to whether Plaintiffs breached the agreement in their billing of new site buildouts. Accordingly, the Court denies

14

Plaintiffs' motion for summary judgment on Horizon's counterclaim for breach of contract.[3]

### 2.    Plaintiffs' Claim

Plaintiffs assert that Horizon breached the MSA and SOW by failing to pay Plaintiffs' invoices.  Plaintiffs argue that they are entitled to summary judgment on their claim for breach of contract because the unambiguous provisions of the parties' agreement permitted Plaintiffs' invoices and Horizon was required to pay those invoices.  As discussed above, however, there is a genuine dispute of material fact as to Plaintiffs' billing of new site buildouts.  "As a general rule, if either party to a bilateral contract commits a material breach of the contract, the non-breaching party is excused from the obligation to perform further."  McClure Lumber Co. v. Helmsman Constr., Inc., 585 S.E.2d 234, 239 (N.C. Ct. App. 2003).  "The question of whether a breach of contract is material is ordinarily a question for a jury."  Supplee v. Miller-Motte Bus. Coll., Inc., 768 S.E.2d 582, 593 (N.C. Ct. App. 2015).  Accordingly, the jury must decide whether Plaintiffs breached the agreement in their billing of new site buildouts and, if so, whether that breach was material so as to have excused Horizon's performance obligations.  Therefore, the Court denies Plaintiffs' motion for summary

---

[3] The Court notes that Plaintiffs make additional arguments regarding the other aspects of Horizon's counterclaim for breach of contract, including Horizon's allegations that Plaintiffs improperly billed travel time as labor hours and inadequately performed their contractual obligations.  Because the Court concludes that there is a genuine dispute of material fact regarding Plaintiffs' billing of new site buildouts that precludes summary judgment in favor of Plaintiffs, the Court need not address Plaintiffs' additional arguments regarding the other aspects of Horizon's counterclaim.

15

judgment on their breach of contract claim.

### D. Fraud and Negligent Misrepresentation

Plaintiffs and Horizon assert claims for fraud and negligent misrepresentation. Plaintiffs allege that Horizon falsely misrepresented that it would participate in good faith in the invoice review meetings and that it would pay $471,826.23 towards the outstanding balance on Plaintiffs' invoices from November 2016 through March 2017. Horizon's fraud and negligent misrepresentation counterclaims allege that Plaintiffs intentionally billed Horizon for amounts for which Plaintiffs were not permitted to bill Horizon under the agreement and disguised those improper charges in their invoices. Plaintiffs move for summary judgment on their fraud and negligent misrepresentation claims, as well as Horizon's fraud and negligent misrepresentation counterclaims. Horizon moves for summary judgment on Plaintiffs' fraud and negligent misrepresentation claims, arguing that those claims are barred by the economic loss rule.

"The economic loss rule addresses the intersection between contract remedies (including warranty remedies) and tort remedies." Kelly v. Georgia-Pacific LLC, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009). "North Carolina's economic loss rule provides that ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 164 (4th Cir. 2018) (quotation marks and brackets omitted). Under that rule, "[a] tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to perform was due to the negligent or

intentional conduct of that party." Rountree v. Chowan Cty., 796 S.E.2d 827, 830 (N.C. Ct. App. 2017). "It is the law of contract, not tort law, which defines the obligations and remedies of the parties in such a situation." Legacy, 889 F.3d at 164 (quotation marks omitted). "The economic loss doctrine thus encourages contracting parties to allocate risks for economic loss themselves, because the promisee has the best opportunity to bargain for coverage of that risk or of faulty workmanship by the promisor." Severn Peanut Co. v. Indus. Fumigant Co., 807 F.3d 88, 94 (4th Cir. 2015) (quotation marks omitted). "North Carolina law requires courts to limit plaintiffs' tort claims to only those claims which are identifiable and distinct from the primary breach of contract claim." Legacy, 889 F.3d at 164 (quotation marks omitted). In other words, a "tort action must be grounded on a violation of a *duty* imposed by operation of law, and the right invaded must be one that the law provides without regard to the contractual relationship of the parties." Rountree, 796 S.E.2d at 831 (quotation marks omitted) (emphasis in original). "In recognition of the fundamental difference between tort and contract claims, and in order to keep open-ended tort damages from distorting contractual relations, North Carolina has recognized an independent tort arising out of breach of contract only in carefully circumscribed circumstances." Broussard v. Meineke Disc. Muffler Shops, 155 F.3d 331, 346 (4th Cir. 1998) (quotation marks omitted). "In so doing, North Carolina courts have strived to keep tort and contract law . . . within their separate spheres." Kelly, 671 F. Supp. 2d at 791.

The Court concludes that the economic loss rule bars Plaintiffs' and Horizon's

claims for fraud and negligent misrepresentation. Plaintiffs' attempt to characterize their claims as arising out of "a separate, independent, extracontractual invoice review process," (Doc. No. 230, at 17 n.8), overlooks the critical fact that the invoice review was not extracontractual at all, but instead was required by and undertaken in accordance with the MSA's informal dispute resolution procedure that obligated the parties to attempt in good faith to resolve any disagreement or dispute, (Doc. No. 171, § 8.1). Plaintiffs' claim that Horizon misrepresented that it would participate in good faith in the invoice review process is the quintessential claim of a mere unfulfilled contractual promise that cannot be the basis of a fraud claim. Strum v. Exxon Co., 15 F.3d 327, 331 (4th Cir. 1994) ("The mere failure to carry out a promise in contract . . . does not support a tort action for fraud."). The same is true of Plaintiffs' claim that during the invoice review, Horizon misrepresented that it would pay a specific amount towards Plaintiffs' outstanding invoices—such a claim concerns Horizon's performance under, and compliance with, the parties' agreement. See Mecklenburg Cty. v. Nortel Gov't Sols., Inc., No. 3:07-cv-00320, 2008 U.S. Dist. LEXIS 110381, at *12 (W.D.N.C. Apr. 1, 2008) (dismissing plaintiff's fraud and negligent misrepresentation claims where plaintiff "fail[ed] to allege distinct and identifiable facts outside of contract performance").

Likewise, Horizon's claim that Plaintiffs intentionally billed Horizon for amounts for which Plaintiffs were not permitted to bill under the agreement and disguised those improper amounts in their invoices is not identifiable and distinct from the alleged breach of contract. The MSA and SOW created Plaintiffs' obligations

with respect to invoicing and determined the scope of what Plaintiffs were permitted to charge Horizon. Accordingly, like Plaintiffs' claims, Horizon's claim is based on Plaintiffs' performance under, and compliance with, the parties' agreement. See id., 2008 U.S. Dist. LEXIS 110381, at *13 (stating that "[s]uch negligent or intentional actions, relating to contract performance, do not transform contract claims into independent torts"); see also Forest2Market, Inc. v. Arcogent, Inc., 2016 NCBC LEXIS 3, at *8–12 (N.C. Super. Ct. Jan. 5, 2016) (concluding that the economic loss rule barred plaintiff's fraud and negligent misrepresentation claims where plaintiff claimed that defendant deceptively overbilled plaintiff and the parties' contract governed the parties' rights and obligations regarding billing).

The Court recognizes that the economic loss rule does not bar a claim that a party was fraudulently induced to enter a contract; however, the parties do not claim that they were fraudulently induced to enter into the MSA or SOW. Instead, the parties' tort claims concern the parties' performance under the contract and alleged breaches thereof, and a party "may not circumvent the economic loss rule simply by claiming that a breach of contract claim also sounds in fraud." Legacy, 889 F.3d at 166. "Simply put, this case involves an attempt by [all parties] to manufacture a tort dispute out of what is, at bottom, a simple breach of contract claim." Strum, 15 F.3d at 329. This is a dispute between sophisticated, commercial parties who drafted detailed contracts to govern their relationship, including provisions contemplating future disputes between the parties as to invoices and other matters. To allow the parties to pursue tort claims in what is, at its core, a pure contractual dispute would

19

be "inconsistent both with North Carolina law and sound commercial practice." Strum, 15 F.3d at 329. Therefore, the Court dismisses the parties' claims for fraud and negligent misrepresentation.

### E.    Violation of N.C. Gen. Stat. § 75-1.1

Plaintiffs and Horizon assert claims for unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1. Like their fraud and negligent misrepresentation claims, Plaintiffs' claim under section 75-1.1 is based on Horizon's alleged misrepresentation that it would participate in good faith in the invoice review meetings and that it would pay $471,826.23 towards the outstanding balance on Plaintiffs' invoices from November 2016 through March 2017. Similarly, Horizon's claim under section 75-1.1 is based on Plaintiffs' alleged intentional billing for amounts for which Plaintiffs were not permitted to bill Horizon under the agreement and concealment of those improper charges in their invoices. Plaintiffs move for summary judgment on their claim under section 75-1.1, as well as Horizon's counterclaim under section 75-1.1. Horizon moves for summary judgment on Plaintiffs' claim under section 75-1.1, arguing that such claim is premised on a mere breach of contract.

A claim for unfair or deceptive acts or practices under N.C. Gen. Stat. § 75-1.1 requires "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Walker v. Fleetwood Homes of N.C., Inc., 653 S.E.2d 393, 399 (N.C. 2007). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical,

20

oppressive, unscrupulous, or substantially injurious to consumers." Hills Mach. Co., LLC v. Pea Creek Mine, LLC, 828 S.E.2d 709, 716 (N.C. Ct. App. 2019) (quoting Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981)). "[A] practice is deceptive if it has the capacity or tendency to deceive." Walker, 653 S.E.2d at 399 (alteration in original) (quoting Marshall, 276 S.E.2d at 403). "The determination as to whether an act is unfair or deceptive is a question of law for the court." Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001).

"It has been said that because proof of unfair or deceptive trade practices entitles a plaintiff to treble damages, a [claim under section 75-1.1] constitutes a boilerplate claim in most every complaint based on a commercial or consumer transaction in North Carolina." Broussard, 155 F.3d at 347 (quotation marks omitted). As a result, "and to keep control of the extraordinary damages authorized by [section 75-1.1], North Carolina courts have repeatedly held that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [section 75-1.1]." Id. (quotation marks omitted). "In this sense, North Carolina law does not allow a party to transmogrify a claim for simple breach of contract into a claim for unfair and deceptive trade practices absent substantial aggravating circumstances." Dew Elec., Inc. v. Mass Elec. Constr. Co., No. 3:09-cv-361, 2010 U.S. Dist. LEXIS 52072, at *11 (W.D.N.C. May 25, 2010) (quotation marks omitted). "The type of conduct that has been found sufficient to constitute a substantial aggravating factor has generally involved forged documents, lies, and fraudulent inducements." Stack v. Abbott Labs., Inc., 979 F. Supp. 2d 658, 668 (M.D.N.C. 2013). "North

Carolina courts are extremely hesitant to allow plaintiffs to attempt to manufacture a tort action and alleged [unfair or deceptive acts or practices] out of facts that are properly alleged as breach of contract." Birtha v. Stonemore, N.C., LLC, 727 S.E.2d 1, 10 (N.C. Ct. App. 2012).

The Court concludes that the parties have failed to show substantial aggravating circumstances surrounding the alleged breaches of contract to support their claims under section 75-1.1. As discussed above with respect to the fraud and negligent misrepresentation claims, this is a contract dispute. The parties' claims are based on the parties' performance under the MSA and SOW and alleged breaches thereof, and "[i]t is unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." Bob Timberlake Collection, Inc. v. Edwards, 626 S.E.2d 315, 323 (N.C. Ct. App. 2006) (quotation marks omitted). Moreover, "[t]here is nothing so oppressive or overreaching about [the parties'] behavior in breaching the contract that would transform the case into one for unfair trade practices." Supplee, 768 S.E.2d at 599. Simply put, "[g]iven the contractual center of this dispute, [the parties' section 75-1.1] claims are out of place." Broussard, 155 F.3d at 347. If Plaintiffs or Horizon "failed to fulfill [their] contractual obligations, the remedy is contract damages, not the blank check afforded to juries when they are authorized to return a punitive award." Id. Therefore, the Court dismisses the parties' claims for unfair or deceptive acts or practices under section 75-1.1.

### III. MOTION TO STRIKE

Plaintiffs move to strike the expert reports of Bruce F. Webster and Leanne Gould, arguing that the experts' testimony is inadmissible under Federal Rules of Evidence 403 and 702. (Doc. No. 124.) Plaintiffs filed the motion on October 30, 2019—long before the trial of this matter and before the experts had been deposed. In fact, the experts' reports were not a part of the record until Plaintiffs filed them as an attachment to their motion to strike.

The Court concludes that Plaintiffs' motion was premature. As Plaintiffs filed the motion before the experts were deposed, the parties did not have the benefit of the expert's testimony in briefing the motion, and the Court does not have the benefit of that testimony in determining the reliability of the experts' offered opinions. <u>See</u> <u>Tucker v. Cracker Barrel Old Country Store, Inc.</u>, No. 7:14-cv-3889, 2016 WL 11498739, at *2 (D.S.C. Mar. 30, 2016) (denying motion to exclude expert testimony as premature where the expert had not been deposed because without the expert's testimony, the court was unable to determine whether the expert's offered opinions were reliable). Therefore, the Court denies Plaintiffs' motion without prejudice to refiling the motion on or before October 19, 2020 as set forth in the Court's scheduling order. (Doc. No. 23.)

### IV. CONCLUSION

**IT IS THEREFORE ORDERED** that:

1.  Horizon's motion for partial summary judgment, (Doc. No. 163), is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as

23

to Plaintiffs' claims for fraud, negligent misrepresentation, and unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, and those claims are **DISMISSED**. The motion is **DENIED** as to Plaintiffs' claim for an account stated;

2. Plaintiffs' motion for summary judgment, (Doc. No. 166), is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as to Horizon's counterclaims for fraud, negligent misrepresentation, and unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, and those claims are **DISMISSED**. The motion is **DENIED** as to Horizon's counterclaim for breach of contract and Plaintiffs' claims for an account stated, breach of contract, fraud, negligent misrepresentation, and unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1; and

3. Plaintiffs' motion to strike, (Doc. No. 124), is **DENIED without prejudice**.

Signed: August 5, 2020

Robert J. Conrad, Jr.
United States District Judge

24